No. 47,627

In the Interest of Richard Nelson, Ralph Nelson, Jr., Anita Nelson, Edward Nelson, Leslie Nelson, Vianita Nelson, Larry Nelson and Gary Nelson, Children under eighteen (18) years of age. (State of Kansas, *Appellee,* v. Ralph Nelson, Sr., *Appellant.*)

(531 P. 2d 48)

Opinion filed January 25, 1975.

*Frank M. Rice,* of Jones, Schroer and Rice, Chartered, of Topeka, argued the cause and was on the brief for the appellant.

*Vern Miller,* attorney general, *Gene M. Olander,* district attorney, and *Charles Andrews,* special prosecutor, were on the brief for the appellee.

*Thomas A. Valentine,* of Sloan, Listrom, Eisenbarth, Sloan and Glassman, of Topeka, argued the cause and was on appellee's brief as guardian *ad litem.*

The opinion of the court was delivered by

Harman, C.: This is an appeal in a proceeding wherein parental rights were severed pursuant to K. S. A. 38-824 and related provisions in our juvenile code. The issues here are the admissibility of one item of evidence and sufficiency of the evidence to support findings of dependency and neglect and parental unfitness.

Appellant Ralph Nelson, Sr. is the natural father of the eight children in question: Ralph Nelson, Jr., born September 21, 1959; Anita Nelson, born December 8, 1960; Edward Nelson, born July 18, 1962; Leslie Nelson, born July 2, 1963; Vianita Nelson, born December 11, 1964; Larry and Gary Nelson, born May 28, 1966; and Richard Nelson, born July 17, 1968.

Appellant became a full time construction worker when he was fourteen years old. He was a heavy equipment operator over eleven

years. He ceased work in 1970, citing his health as the reason for quitting. Thereafter he drew social welfare payments for the support of himself and family. His wife, the mother of the eight children, died in 1968, and since then he had sole custody of the children in his home in Topeka until they were removed by court order. He was assisted at times in caring for them by a woman who had mental problems and stayed periodically at the Topeka State Hospital.

The proceeding originated December 15, 1971, when a petition was filed in juvenile court to declare the children dependent and neglected and to terminate parental rights. The children were removed from appellant's custody December 17, 1971. After a two-part hearing in juvenile court the children were declared to be dependent and neglected and parental rights were severed. Mr. Nelson appealed this order to district court, where, after *de novo* hearing, the children were again found to be dependent and neglected, appellant was found to be unfit to have their custody and his parental rights were terminated. Appellant brings the matter here for review.

At the hearing on June 21 and 22, 1973, in district court testimony pro and con on the issues involved was heard. Our summary of it will be in the aspect most favorable to the findings made by the trial court. A county welfare social worker testified as to conditions in the Nelson home observed by her during several visits: The house was small, in poor repair and had been converted into a three bedroom home by placing beds in the living and dining rooms; the bedrooms had no closets and there was just room to walk between the beds; the children's clothing, which was in poor condition, was lying on the floors and piled in corners; there was neither space nor chairs for everyone to sit down for a meal together; the kitchen utensils were insufficient; three of the children appeared not to be getting adequate food; there were bags of flour and cornmeal in the kitchen which had been broken into by rodents and roaches and were littered with droppings; she tried to get appellant to move into a larger house which was obtainable at no higher rent but he declined; appellant functioned more as a child; he appeared to be very ineffectual, could not manage money and did not want to make decisions; he was suspicious of doctors; a doctor wanted the youngest child checked for a heart murmur; appellant refused this examination; one girl had a hearing problem; a doctor recommended tonsil and adenoid removal but appellant

declined to permit this; Anita had had a stroke when she was sixteen months of age; she needed arm and leg therapy and orthodontia; the witness took her for treatment one time but appellant would not permit her to be taken again; once when the youngest child was ill appellant stated he wasn't up to taking the child to a doctor and a neighbor who had suggested that the child should have medical attention took him; appellant had a medical card for the entire family; the two oldest boys had a paper route; appellant was uninterested in obtaining work for himself; he did not want the children to play with other children in the neighborhood; the witness saw appellant intoxicated several times; once she roused him with great difficulty; he drank white wine; she discussed his drinking with him but he would not admit any problem although he went once to Alcoholics Anonymous.

A married couple, the Morgans, who were neighbors to appellant for three months prior to the time the children were taken, testified: They saw appellant drinking alcohol many times; he was frequently drunk and was in that condition nearly every day during the latter part of the period; the children requested help of Mrs. Morgan; Mrs. Morgan would clean up the mess in the house three or four times a week and both Morgans would prepare food when appellant was drunk; sometimes he was "passed out" on the front porch; appellant was drinking hard liquor secured from a bootlegger; he occasionally would ask the children to take a drink; the Morgans saw appellant strike the children with his fists when he was drunk; he required the children to wait on him; he was seen to eat first while the children got the leftovers; he slapped Anita once when she got the wrong pan, causing a bruise on her face; he knocked one of the boys down when he came home from his paper route and didn't turn over the money; appellant struck the smallest child on the face when he was sick and cried; Anita said her father slammed a door on her fingers because she was not working fast enough; the witnesses saw bruises on her fingers, shoulders, arms and legs which Anita said appellant had caused.

A family service physician, who was also a psychiatrist, examined four of the children. He testified the twins had retarded speech, were emotionally immature, lacked socialization skills and were preoccupied with concerns of injury and abandonment. He believed the home conditions along with the loss of the mother con-

tributed to their lack of development. He did not find the same conditions in the two older boys.

A child psychiatrist examined the two girls. He believed they had had adequate upbringing until the death of their mother. He found that Anita had a semi-paralyzed right hand, she was shy, had difficulty in pronouncing words and was afraid of receiving physical punishment from her father. Vianita had the same fear but showed less psychological disturbance than Anita. He believed placement in foster homes had been beneficial to both girls.

A county health department worker had visited the Nelson home in 1970; living conditions were poor, furniture was needed, the house was full of roaches and the two children were poorly dressed and needed clothing.

A Kansas Neurological Institute nutritionist attempted to help appellant learn to prepare commodity food; his tableware and kitchenware were inadequate and he failed to provide more; she made several visits in appellant's home and to that of another client nearby; she saw appellant in a drunken condition several times; twice he was lying drunk in the yard in the morning and she had also seen him drunk on the front porch; wine bottles were in the yard and the house was a "total wreck"; she heard him arguing with a neighbor several times; on occasions the police were there; Anita said sometimes they had no chance to eat breakfast and sometimes didn't eat until late at night.

A friend who took appellant to the commodity distribution center and returned with him to the Nelson home about 11:00 a. m. observed there had been no meal for the children over the noon hour; appellant had purchased a bottle of liquor which was gone by 1:30 p. m.; appellant was alseep when the witness left; he had seen appellant drunk on other occasions.

A school teacher in a special education class testified Anita had made remarkable improvement in the class from December, 1971, to May, 1972; she thought the change had been brought about by Anita's placement in a foster home.

Anita Nelson testified that while with her dad the children were being beaten with fists and sticks most of the time and she didn't like it; she and Ralph did the washing and they all helped with the cooking; neighbors helped; the children were sometimes hungry after they ate; her father drank a lot; she preferred living in the foster home.

Appellant testified in his own behalf: He drank a little but knew what he was doing; he admitted he was considered an alcoholic, had been so diagnosed by a doctor and had spent a month at the Topeka State Hospital alcoholic section; there was always adequate food for the children and he had sufficient tableware and kitchen equipment; he had never hit the children, except to spank the youngest, and he thought the world of the children and wanted them with him; he used the money from the boys' paper routes to buy clothing; he admitted he had not told the truth in some instances while testifying under oath in juvenile court. He received welfare payments varying from $292.00 to $349.00 per month.

Appellant produced two witnesses who testified the children were clean; neither witness had seen appellant drink except once when he was sick.

The oldest Nelson boy testified that appellant did not beat the children; he drank and was sometimes drunk; Anita did most of the cooking; the witness would rather live in the foster home where he had been staying than with appellant.

Appellant complains the trial court improperly received evidence of events occurring after the petition to sever parental rights was filed. The testimony in question was that of Mrs. Morgan concerning the slapping of Anita by appellant when she got the wrong pan. The witness was uncertain of the exact time of the occurrence, first saying it was before Christmas in 1971, then she fixed the date as December 23, 1971, and when advised the date of the children's removal from appellant's custody was December 17, 1971, she could only say the incident occurred while the children were in the Nelson home. The petition was filed December 15, 1971. Assuming the event in question occurred after the filing of the petition, appellant's contention has no merit. The trial in district court was a *de novo* hearing on the factual issues of the dependency and neglect of the children and appellant's fitness to have their custody and the ultimate issue of the best interests and welfare of the children. The questioned evidence was relevant to those issues and it was not rendered inadmissible because it related to events occurring after the filing of the petition initiating the proceedings. Nothing in our evidentiary code renders such evidence inadmissible nor are we aware of any sound reason why it should be so declared. Legislative intent in promulgating our juvenile code is stated in K. S. A. 38-801 as follows:

"This act shall be liberally construed, to the end that each child coming within its provisions shall receive such care, custody, guidance, control and discipline, preferably in his own home, as will best serve the child's welfare and the best interests of the state. . . ."

That the legislature has contemplated evidence of events occurring subsequent to the filing of a petition to declare children dependent and neglected is admissible in the hearing is demonstrated by K. S. A. 38-817 which provides that if requested by the juvenile court the secretary of social and rehabilitation services shall make such investigation as the court may request and report the findings to the court upon the hearing of the petition. Such an investigation and report might well encompass events occurring subsequent to the filing of the petition. The paramount consideration of a court in a case involving custody of minor children is the welfare and best interests of the child (*In re Johnson*, 210 Kan. 828, 504 P. 2d 217), and in determining whether parental rights should be severed courts routinely consider evidence of improvement of a child's attitude, behavior, schooling and physical and mental health after removal from parental custody (see, *e. g., In re Johnson*, 214 Kan. 780, 522 P. 2d 330).

Appellant attacks the sufficiency of the evidence to support the findings of dependency and neglect and of his unfitness, citing the rule that a natural parent will not be deprived of the custody of his child in the absence of clear and convincing evidence (*In re Stafford*, 193 Kan. 120, 392 P. 2d 140). We think the evidence here is of that character (see *In re Bachelor*, 211 Kan. 879, 882-883, 508 P. 2d 862, for definitions and examples of the terms "dependent and neglected children" and "unfitness"). Appellant's challenge to the evidence largely derives from testimony produced by him which the trial court chose not to believe. It is not our province to usurp that court's fact-finding function and reweigh the total evidence adduced—were we to do so we would have difficulty reaching a different conclusion from that of the two tribunals which have already heard the case.

The state's evidence, which came from a number of apparently objective witnesses and extended over a considerable period of time, was largely unrefuted except by appellant himself. We will not repeat that evidence. It revealed a pattern of neglect and indifference in a number of areas important to the well-being of the children as well as outright abuse of them, bottomed in part at least on appellant's unfortunate addiction to alcohol.

Clear and convincing evidence supported the trial court's findings and its judgment is affirmed.

APPROVED BY THE COURT.